UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM SAOUD,
PATRICIA BOLAND-SAOUD, and
BILL SAOUD FINANCIAL, LLC,

      Plaintiffs/Counter-Defendants,

v.

EVEREST INDEMNITY INSURANCE
COMPANY,

      Defendant/Counter-Claimant.

Case No. 19-12389
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT [21, 22]
AND HOLDING THE REMAINDER OF THOSE MOTIONS IN
ABEYANCE PENDING SUPPLEMENTAL BRIEFS**

---

At the center of this case is whether an insurer is required to pay for losses sustained by the insured. William Saoud runs Bill Saoud Financial, LLC, a company that sells insurance and other financial products. In 2017 and 2018, Saoud offered several of his clients an investment product called the 1 Global "Memorandum of Indebtedness." 1 Global later went bankrupt, and the company and its CEO were sued by the Securities and Exchange Commission for, among other things, selling unregistered securities. Saoud's clients who invested in 1 Global sued Saoud alleging, among other things, that he sold them unregistered securities. When Saoud offered the 1 Global memorandum, he had professional liability insurance from Everest Indemnity Insurance Company. So when he was sued by his clients, Saoud asked Everest to defend and indemnify him. But Everest never gave a final response.

Eventually, Saoud, Saoud Financial, and Patricia Boland-Saoud (Saoud's wife and an employee of Saoud Financial) brought this lawsuit seeking a declaration of insurance coverage.

Both the Saouds and Everest seek summary judgment. Summary judgment is usually all about the evidence. Here, though, the record does not contain much evidence. Indeed, as far as the summary-judgment record indicates, no depositions were taken in this case. And there are only two affidavits of record, both of which were prepared for use in a different case. True, the record does contain documentary evidence. But even that evidence is not as robust as it should have been—for instance, neither party has supplied the court with the 1 Global "Memorandum of Indebtedness" that caused all the trouble. Given the state of the evidentiary record, the Court cannot decide whether the policy Everest issued requires Everest to reimburse the Saouds for their losses arising out of the sale of the 1 Global memorandum. Accordingly, as detailed below, the Court will order the parties to file supplemental briefs and to supplement the record.

## I.

### A.

The information in this section is taken from two complaints filed by the U.S. Securities and Exchange Commission against 1 Global Capital, LLC and assisting lawyer Jan Atlas and, as such, the Court does not treat them as facts for purposes of resolving the pending summary-judgment motions. The Court presents the SEC's allegations because they provide helpful context for the facts of this case.

1 Global was founded in 2013. *See* Am. Compl., *Securities & Exchange Commission v. 1 Global Capital LLC*, No. 18-61991 (S.D. Fla. Sept. 26, 2018). Its CEO was Carl Ruderman. *Id.* at 8. 1 Global promoted itself to small and medium-sized businesses as an alternative source for short-term loans. *Id.* at 9. In exchange for a loan from 1 Global, a business would assign a portion of its accounts receivable to 1 Global. *Id.* at 10.

1 Global obtained the funds it lent to these small and medium-sized businesses from investors. To find these investors, 1 Global used a network of sales agents. *Id.* at 11. Many of these sales agents received three percent of every new investment brought into 1 Global. *Id.* at 12. 1 Global provided its sales agents with marketing materials that indicated to investors that their return on investment would be high, 10 percent or more of their investment amount. *Id.* at 14. If an investor agreed to provide 1 Global with funding, the investor would sign a "Memorandum of Indebtedness." *Id.* at 15. Once 1 Global obtained the investment funds, it would give each investor a small, fractionalized interest in hundreds of loans to the businesses. *Id.* at 16. According to the SEC, from "February 2014 until July 27, 2018, 1 Global . . . raised more than $287 million from more than 3,400 investors." *Id.* at 1.

Unfortunately for these investors, Ruderman used $50 million of investor funds to purchase bad credit card debt. *Id.* at 19. Another $28 million went to "Ruderman personally as well as several companies in which he or his family members had a direct interest." *Id.* "Largely as a result of 1 Global and Ruderman's misappropriation and improper use of investor funds," "by June 30, 2018, 1 Global's

financial records showed approximately $50 million in missing investor funds." *Id.* In July 2018, 1 Global filed for bankruptcy. *Id.* at 26.

In August 2018, the SEC sued 1 Global, Ruderman, and related entities in the U.S. District Court for the Southern District of Florida. *Sec. & Exch. Comm'n v. 1 Global Capital LLC*, No. 18-61991 (S.D. Fla. filed Aug. 23, 2018). The SEC asserted, among other things, that 1 Global and Ruderman sold securities that had not been registered as required by the Securities Act of 1933.

About a year later, the SEC sued Jan Atlas, a securities lawyer that allegedly aided 1 Global and Ruderman in violating federal securities laws. Complaint, *Sec. & Exch. Comm'n v. Atlas*, No. 19-62303 (S.D. Fla. Sept. 17, 2019) *available at* (ECF No. 26-3). The SEC alleged that after an attorney told 1 Global that the Memorandum of Indebtedness was likely a security (and thus subject to registration under the Securities Act), Ruderman reached out to Atlas, a securities lawyer. *Id.* at 4–5. According to the SEC, Atlas drafted a letter opining that the memoranda were not securities, despite being aware of facts strongly indicating that they were. *Id.* Further, after 1 Global's then-CFO obtained yet another law firm's opinion that the memoranda were securities, Ruderman again reached out to Atlas, and Atlas again drafted a letter opining that the memoranda were not securities. *Id.* at 5. According to the SEC, 1 Global used Atlas' letters "to assure its external sales agents, some of whom bought 1 Global's notes themselves, that the notes were not securities and the agents did not need to have a securities license to offer and sell the notes." *Id.* at 6. Further, "[i]t was important to the external sales agents to know that the notes 1

4

Global offered were not securities and absent the assurance that the notes were not securities they would not have offered 1 Global's notes to investors." *Id.*

## B.

William Saoud is the sole owner and member of Bill Saoud Financial, LLC. (ECF No. 21, PageID.362.) Saoud Financial sells insurance-related products, such as life insurance and annuities. (*Id.*)

At some point—likely in 2017—Saoud learned of 1 Global's financial product. Prior to becoming involved with the company, Saoud "was advised that the 1 Global loans . . . were not securities and that [he] did not need to be registered as a securities broker or agent." (ECF No. 29, PageID.762.) Saoud "was advised by more than one attorney that 1 Global loans were not securities." (*Id.*)

In late 2017 and the first half of 2018, Saoud Financial provided some of its clients with information on 1 Global's Memorandum of Indebtedness. It appears that this included Victoria Berardi, Robin Diller, Judith Grady, and Michael and Deborah Tremblay. (*See* ECF No. 21, PageID.374, 376, 385, 387, 470, 472, 510, 512, 524.) As for Berardi, Diller, and Grady, they each attended one of Saoud's educational seminars "on retirement planning and insurance." (ECF No. 21, PageID.362.) According to Saoud, after the seminars, he met with Berardi, Diller, and Grady at their request. (*Id.*) Saoud recalls that each sought "alternatives to insurance products." (*Id.*) After they expressed interest, he presented materials about 1 Global's Memorandum of Indebtedness. (*Id.*) Saoud asserts that he "made no representations about the 1 Global loan product, other than distributing the materials." (*Id.*) Further,

Saoud says that each of Berardi, Diller, and Grady was "very experienced and sophisticated," did not rely on him for advice, and "made [her] own decision." (*Id.* at PageID.363.)

In the spring and summer of 2018, both Michigan's Department of Licensing and Regulatory Affairs ("Licensing Department") and the SEC got wind that Saoud Financial was offering the 1 Global memoranda. In May 2018, the Licensing Department ordered Saoud to cease and desist from offering or selling securities that were not registered under Michigan's Securities Act. (ECF No. 22, PageID.635.) And the SEC, likely in connection with its investigation into 1 Global, sent Saoud Financial a subpoena for documents relating to the company's sale of 1 Global memoranda. (ECF No. 21-5, PageID.413.)

Saoud and his company faced additional accusations during the remainder of 2018. In September 2018, the Licensing Department issued another cease-and-desist order, accusing Saoud of continuing to sell unregistered securities after the prior cease-and-desist order. (ECF No. 22, PageID.637.) Further, in late 2018, Berardi, Diller, and Grady each sued Saoud and his company. (ECF No. 21, PageID.374, 385, 397.) Each accused Saoud of, among other things, selling a security that was not registered under Michigan's Securities Act and committing fraud. (ECF No. 21, 376–378, 388–390, 400–401.)

In December 2018, with the three lawsuits pending, Saoud filed an insurance claim with the defendant in this case, Everest Indemnity Insurance Company. (*See* ECF No. 21, PageID.368 (referencing December 2018 claim).)  Under the insurance

policy, Everest agreed to pay for losses resulting from Saoud's wrongful acts in rendering "Professional Services." (*See* ECF No. 22, PageID.586.) Everest also had a duty to defend Saoud against any claim "covered under [the] policy." (*Id.*) It appears that Saoud's insurance claim was only for the Berardi lawsuit. (*See* ECF No. 21, PageID.487–488 (Everest's response referencing only the Berardi suit); *but see* ECF No. 21, PageID.368 (Saoud's February 2019 letter stating that notice was given of the "aforementioned matters," plural).)

That same month, Everest's claims handler, Lancer Claims Services, responded to Saoud's insurance claim. But rather than clearly denying coverage or clearly reserving Everest's rights to later deny coverage, Lancer was equivocal as to Everest's coverage position. In a letter, Lancer stated, "[We] will coordinate the handling of [the Berardi] matter and will be in contact with you and the appropriate parties. In the interim, if you are contacted by the claimants in this matter, or anyone representing them, please refer them to my office." (ECF No. 21, PageID.487.) That letter thus hinted at coverage. But the same day, Lancer sent an email stating, "While we investigate coverage, you should proceed to retain your own attorney to assist you. If we determine that there is coverage, we will reimburse you for your fees and expenses after the deductible." (ECF No. 21, PageID.488.) That email hinted that there might be no coverage.

By February 2019, Saoud and his company had heard nothing further from Everest; so Saoud's then-counsel sent Everest (via Lancer) a letter renewing his request for coverage. (ECF No. 21, PageID.368.) The letter attached the complaints

from *Berardi*, *Diller*, and *Grady*. (*See id.* at PageID.369.) The letter also requested reimbursement for the attorney's fees expended in the proceedings before the Licensing Department and in responding to the SEC's subpoena. (*Id.* at PageID.370.) The letter advised Everest that Saoud had already expended about $100,000 in legal fees in the various proceedings. (*Id.* at PageID.371–372.)

In March 2019, an administrative consent agreement ended the proceedings initiated by Michigan's Licensing Department. (ECF No. 22, PageID.626.) Saoud agreed not to sell any financial-service product (other than insurance products) without first obtaining a legal opinion that the product was not a security under Michigan's Securities Act. (*Id.* at PageID.628.) Saoud also agreed to pay a fine of $25,000. (*Id.*) Via the consent agreement, Saoud "neither admit[ted] nor den[ied] the allegations in the [cease-and-desist orders] or any wrongdoing in connection with this matter." (ECF No. 22, PageID.629.)

That month, March 2019, the Tremblays also sued Saoud and his company. *Tremblay v. Saoud*, No. 2019-001187-NZ (Mich. 16th Cir. Ct. filed Mar. 8, 2019). Like Berardi, Diller, and Grady, the Tremblays alleged (among other things) that Saoud sold unregistered securities in violation of Michigan's Securities Act. (ECF No. 1, PageID.94.)

By May 2, 2019, Saoud and his company still had not received a decision from Everest regarding coverage. So his then-counsel sent another letter to Everest (again via Lancer). The letter stated that Saoud remained "in limbo" as to whether Everest would defend and indemnify him and his company for the Berardi, Diller, and Grady

8

suits, the Licensing Department proceeding, and the SEC subpoena. (ECF No. 21, PageID.490.) (The letter did not mention the Tremblays' suit.) The letter also advised of a mediation in four days to resolve the three lawsuits and requested "Everest's participation in [the] mediation." (*Id.*)

The Berardi, Diller, Grady, and Tremblay actions all resolved without Everest's participation. As for the suit filed by the Tremblays, that case was still pending when this lawsuit was filed but has since been dismissed. *See Tremblay v. Saoud*, No. 2019-001187-NZ, slip op. at 6 (Mich. 16th Cir. Ct. Oct. 16, 2019) (finding claims time barred) *available at* (ECF No. 21-11). Everest did not participate in the Tremblays' suit, either.

## C.

On July 10, 2019—the day before the Berardi action settled—William Saoud, Saoud Financial, and Patricia Boland-Saoud filed this lawsuit against Everest in state court. (The Court will refer to William Saoud as "Saoud" and all three plaintiffs as "the Saouds.") At the time they filed this action, the Saouds still had not received a coverage decision from Everest. So the Saouds sought (and still seek) a declaration that the Berardi, Diller, Grady, and Tremblay actions, as well as the Licensing Department proceeding and the SEC subpoena, are covered by the insurance policy. (ECF No. 1, PageID.17.) The Saouds' complaint also includes a breach-of-contract claim: Everest breached the policy by not defending them in the various proceedings and by not reimbursing them for the settlements and attorney's fees they paid. (ECF

No. 1, PageID.18.) (The complaint included two other counts, but they have since been dismissed. (ECF No. 13.))

Everest removed the Saouds' case to this federal court and not only answered but filed a counterclaim. (ECF Nos. 1, 4.) In its counterclaim, Everest seeks a declaration that the state court lawsuits, the Licensing Department proceedings, and the SEC subpoena are not covered by the policy. (ECF No. 4, PageID.164–165.) And in answering the Saouds' complaint, Everest raised a host of affirmative defenses, including that the losses stemming from Saoud's offer of the 1 Global product fall within a policy exclusion for unregistered securities. (ECF No. 4, PageID.158.)

Both sides think there is no reason for their claims to be presented to a jury. In particular, the Saouds have filed a motion for summary judgment (ECF No. 21), and Everest has filed a motion for judgment on the pleadings (ECF No. 22), which the Court converted to a motion for summary judgment after giving the parties an opportunity to supplement the record (ECF No. 30). So cross motions for summary judgment under Federal Rule of Civil Procedure 56 await resolution.

## II.

Rule 56 says, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

When, as here, there are cross motions for summary judgment, the Court considers them separately, and it not necessarily the case that either party is entitled to summary judgment. *See Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442

(6th Cir. 2021). When considering Everest's motion, the evidence is viewed in the light most favorable to the Saouds and the initial (and ultimate) burden is on Everest to show that it is entitled to judgment as a matter of law. *See id.* The opposite is true when considering the Saouds' motion. *See id.*

## III.

The parties have proceeded under the assumption that the insurance policy at issue is governed by Michigan law, and under Michigan law, a two-step analysis is used to decide a coverage dispute like this one. *Auto Owners Ins. Co. v. Seils*, 871 N.W.2d 530, 539 (Mich. Ct. App. 2015). One: does the policy's general terms cover the incident? *See id.* Two: if the policy's general terms cover the incident, does an exclusion negate coverage? *See id.* The insureds, the Saouds, have the burden at step one. *See id.* The insurance company, Everest, has the burden at step two. *See id.*

## A.

The Court begins with step one.

Under the general terms of the policy, Everest had a duty to indemnify the Saouds for certain losses and to defend them against certain claims. Regarding the duty-to-defend, Everest agreed "to defend any Claim covered under this policy[.]" (ECF No. 22-1, PageID.586.)[1] In turn, a "Claim" includes "a civil adjudicatory . . . proceeding against the Insured for monetary damages . . . brought by . . . any Client for a Wrongful Act in rendering . . . *Professional Services*." (ECF No. 22-1,

---

[1] Throughout the opinion, the Court cites only the policy for September 2017 to September 2018 (ECF No. 22-1) because the policy for September 2018 to September 2019 is identical in all material respects.

11

PageID.588–589 (emphasis added).) Regarding indemnification, Everest agreed to "pay on behalf of the Insured the Loss . . . as a result of a Claim . . . made against the Insured . . . for a Wrongful Act committed . . . in rendering . . . *Professional Services*." (ECF No. 22-1, PageID.586 (emphasis added).) Thus, Everest's duty to indemnify and defend the state court lawsuits filed by Berardi, Diller, Grady, and the Tremblays depends on whether those suits claimed that Saoud engaged in a wrongful act in rendering "Professional Services."

Everest argues that no reasonable jury could find that when Saoud Financial provided its clients information about 1 Global's Memorandum of Indebtedness, Saoud was engaged in "Professional Services" covered by the policy. (*See* ECF No. 22, PageID.563–569.)

Stripping the definition down to the relevant language, "Professional Services" includes the following services (to the extent that they were provided "in the course and scope" of Saoud's business and he "ha[d] the appropriate license"):

> (a) the . . . attempted sale . . . of life insurance, accident and health insurance or managed health care organization contracts (that does not require a securities license);
>
> (b) the . . . attempted sale . . . of disability income insurance (if purchased as indicated on the Certificate of Insurance);
>
> (c) the . . . attempted sale . . . of indexed/fixed annuities, (if purchased as indicated on the Certificate of Insurance); . . .
>
> *(e) financial planning activities in conjunction with services described in paragraphs (a) through (d) (if purchased) of this definition, whether or not a separate fee is charged[.]*

(ECF No. 22-1, PageID.590 (emphasis added).)

The key is paragraph (e). While the 1 Global memorandum was almost certainly not insurance or an annuity that falls within any of paragraphs (a), (b), or (c), a reasonable jury could find that when Saoud offered the 1 Global memorandum to Berardi, Diller, and Grady, he was engaged in "financial planning activities in conjunction with services described in paragraphs (a) through (d)."

A reasonable jury could reach this conclusion based on an affidavit filed in the Berardi, Diller, and Grady lawsuits. There, Saoud swore to the following:

> 8. At the seminars that [Berardi, Diller, and Grady] attended, I did not discuss the 1 Global loans. All of my education seminars focus on retirement planning and insurance.
>
> 9. Following the education seminars [that Berardi, Diller, and Grady] attended, I met with each [of them] at their request.
>
> 10. During these individuals' meetings, and only after each [of Berardi, Diller, and Grady] requested of me some alternatives to insurance products, did I discuss the 1 Global loan with them.
>
> 11. Materials on the 1 Global loan product were provided to [Berardi, Diller, and Grady] after they expressed an interest in alternative products to insurance products.

(ECF No. 21-3, PageID.362.) From those averments, a reasonable jury could find that the seminars about retirement planning and insurance were "attempted sales" of "life insurance, accident and health insurance or managed health care organization contracts," "disability income insurance," or "indexed/fixed annuities," as described in paragraphs (a), (b), and (c) of the definition of Professional Services. Further, because Saoud's affidavit states that at the subsequent meetings, Berardi, Diller, and Grady "requested of [him] some alternatives to insurance products," a reasonable jury could further find that insurance or retirement products described in paragraphs (a),

(b), and (c) were also discussed at the meetings. Thus, a reasonable jury could find that when Saoud offered the 1 Global memorandum at the meetings, he was engaged in "financial planning activities in conjunction with services described in paragraphs (a) through (d)." It follows that a reasonable jury could find that when Saoud offered the 1 Global memorandum to Berardi, Diller, and Grady, he was engaged in "Professional Services" under the policy.

Everest resists this result in several ways; none persuade.

For one, Everest suggests that in deciding whether Berardi's, Diller's, or Grady's claims were for wrongful acts in rendering Professional Services, this Court is constrained to the allegations of Berardi's, Diller's, and Grady's complaints. (*See* ECF No. 27, PageID.735–736.) In other words, Everest argues that this Court should not consider Saoud's affidavit. (*See id.*)

If the policy were governed by another state's law, Everest might be right. In many jurisdictions, courts deciding whether an insurer has a duty to defend a claim examine only the allegations of the underlying complaint and the insurance policy— a so called "8 corners" approach. *See e.g.*, *Am. Auto. Inc. Co. v. Mayfield*, 287 F. Supp. 2d 661, 664 (N.D. Tex. 2003). But it appears that Michigan does not follow this 8-corners approach—at least where it is the insured seeking to go beyond the 8-corners. *Cf. Upjohn Co. v. Aetna Cas. & Sur. Co.*, 768 F. Supp. 1186, 1196 (W.D. Mich. 1990) (citing cases where *insurance company* could not go beyond the 8-corners to deny coverage).

In *Shepard Marine Construction Co. v. Maryland Casualty Co.*, the Michigan Court of Appeals held that an insurer was required to indemnify the insured's losses in an underlying lawsuit despite the fact that the allegations of the underlying compliant indicated that there was no coverage. 250 N.W.2d 541, 542 (Mich. Ct. App. 1976). In the underlying lawsuit, a township sued a construction company for damaging the township's water main. *Id.* The construction company then sued its insurer seeking a declaration of coverage. *See id.* At issue in the coverage suit was whether the water main was damaged during construction or upon completion of construction. *See id.* Tracking the allegations of the township's complaint, the insurer argued that the damage occurred during construction. *See id.* But in the underlying suit, the construction company and township had stipulated that the damage occurred "upon completion of construction." *See id.* The Michigan Court of Appeals held that it was proper to base the coverage determination on the stipulated facts instead of the township's complaint: "The insurer has the duty to look behind the [township's] allegations to analyze whether coverage is possible . . . . [The insurer] cannot use the technicalities of pleading to dispel the stipulated facts that construction operations were completed." *Id.* at 542–43.

Subsequent decisions have affirmed *Shepard Marine*'s holding. In *Detroit Edison Co. v. Michigan Mutual Insurance Co.*, the Michigan Court of Appeals— relying on *Shepard Marine*—stated, "The duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible." 301 N.W.2d 832, 835

(Mich. Ct. App. 1981). And the Michigan Supreme Court has quoted this very language from *Detroit Edison* with approval. *See Am. Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475, 481 (Mich. 1996). The Sixth Circuit Court of Appeals has also quoted this same language from *Detroit Edison* with approval and has stated, "there is no requirement that the court look only at the complaint and no further to determine whether there is a duty to defend." *Emps. Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995); *see also Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pennsylvania*, 916 F. Supp. 2d 813, 826 (W.D. Mich. 2013).

Accordingly, the Court finds that it is not limited to the allegations in Berardi's, Diller's, and Grady's complaints and that it may consider Saoud's affidavit in deciding whether Saoud's offers of the 1 Global memoranda were "Professional Services."

Next, Everest argues that even if the Court is permitted to consider Saoud's affidavit, it is still entitled to summary judgement at step one of the coverage analysis. According to Everest, Saoud's affidavit shows that Berardi, Diller, and Grady "independently reached out to William Saoud to discuss *alternatives to insurance products*," and thus, Saoud's offer of the 1 Global memorandum was not "in conjunction with" the attempted sale of insurance products. (ECF No. 27, PageID.738; ECF No. 28, PageID.752–753.)

Perhaps Saoud's affidavit could be read that way. But in deciding Everest's motion for summary judgment, the Court must read Saoud's affidavit in the light most favorable to the Saouds. And in that light, Saoud's affidavit suggests that insurance was discussed at the meetings: "During these individuals' meetings, and

16

*only after each [client] requested of me some alternatives to insurance products*, did I discuss the 1 Global loan with them." (ECF No. 22-1, PageID.590 (emphasis added).) Accordingly, the Court does not agree with Everest that the Saouds have essentially pled themselves out of court.

Everest also cites four cases outside Michigan where courts have found that an insured's actions fell outside a "Professional Services" definition similar to the definition at issue here. Three of the cases are readily distinguishable or otherwise not instructive. *Cf. Haney v. Cont'l Cas. Co.*, No. CIV.A 308CV482DPJJCS, 2010 WL 235025, at *5 (S.D. Miss. Jan. 15, 2010) (holding, where insurance agent left his employer and solicited other insurance agents to join him, that agent's solicitation was not a "professional service"); *DeMarco v. Everest Indem. Ins. Co.*, No. SACV0722DOCRNBX, 2008 WL 11336494, at *4–5 (C.D. Cal. Aug. 18, 2008) (holding, where insurance policy covered alarm company's installation and service of alarm systems, that policy did not cover the fraudulent sale of the alarm company's stock); *Am. Auto. Inc. Co. v. Mayfield*, 287 F. Supp. 2d 661, 665 (N.D. Tex. 2003) (holding that insured's sale of securities were not "professional services," but not analyzing whether the sales were "planning activities in conjunction with" covered services).

But the facts of one of Everest's cases are similar enough to the facts of this case that a detailed discussion of that case is warranted. In *Smith v. Continental Casualty Co.*, the Smiths engaged Sprecher, a financial planner, to handle their investments for retirement. No. 07-CV-1214, 2008 WL 4462120, at *3 (M.D. Pa. Sept. 30, 2008). "Sprecher recommended investing in an offshore asset protection trust

17

managed by his friends" with a guaranteed 10 percent annual return. *Id*. After the Smiths invested over $200,000, they learned that the offshore trust was part of a fraudulent scheme. *See id*. So the Smiths sued Sprecher; as part of their settlement, Sprecher assigned his right to sue his insurer, Continental. *Id*. at *4. At issue in the subsequent coverage suit was whether Sprecher's actions were "Professional Services" under the Continental policy. *See id*. at *9. And like the policy at issue in this case, Professional Services included the attempted sale of life, accident, and health insurance, the attempted sale of annuities, and "financial planning activities in conjunction with any of the foregoing." *Id*. at *5. In attempting to survive Continental's motion for summary judgment, the Smiths argued that the "in conjunction with" language was ambiguous. *Id*. at *10. The court rejected that argument: "[Sprecher's] advice and recommendations were not in conjunction with covered products or activities, the only financial planning activities which fall within the scope of coverage." *Id*. at *10 n.9. "Even if Sprecher only gave investment advice," the court explained, "that advice was in conjunction with unregistered and unapproved securities, and thus [did] not fall within the scope of the 'professional services' covered by the Continental policy." *Id*. at *10.

Despite obvious similarities between the facts of this case and those in *Smith*, this Court does not find Smith persuasive for two reasons. First, the court in Smith seems to read "financial planning activities in conjunction with any of the foregoing" to mean that Sprecher's investment advice had to be about one the products listed in "Professional Services." *See Smith*, 2008 WL 4462120 at *10 (explaining that "not just

18

any investment advice is covered, but rather only investment advice *regarding* certain specified products and activities" (emphasis added)). But the ordinary meaning of "in conjunction with" is "in combination with" or "together with." *in conjunction with*, *Merriam-Webster.com*, https://perma.cc/6W3R-G4TP. Arguably then, the investment advice need not be "regarding" a product listed in Professional Services, but only in combination with or together with a listed product. *See id.* ("The medicine is typically used in conjunction with other treatments."). Second, when the Smiths approached Sprecher, it is not clear that he first tried to sell them one of the products listed in the definition of "Professional Services" (e.g., insurance) before ultimately recommending the offshore trust. *See Smith*, 2008 WL 4462120, at *3. Here, as discussed, Saoud says he held a seminar "on retirement planning and insurance," and at the later meetings, Berardi, Diller, and Grady requested "some alternatives to insurance products." (ECF No. 21-3, PageID.362.) So Saoud's offer of the 1 Global product was more "in conjunction with" the attempted sale of products listed in Professional Services (e.g., insurance) than Sprecher's offer of the offshore trust in *Smith*.

Finally, Everest argues that Saoud's offers of the 1 Global memoranda fall outside the definition of "Professional Services" because there is nothing suggesting that any of Berardi, Diller, or Grady ever purchased insurance or any product listed in the definition of Professional Services. (ECF No. 27, PageID.738 n.9.) In support of this argument, Everest highlights the following language from the definition of Professional Services: "(e) planning activities in conjunction with services described

in paragraphs (a) through (d) (*if purchased*) of this definition." (*See id.*; ECF No. 22-1, PageID.590 (emphasis added).)

Everest misconstrues the meaning of "if purchased." "[I]f purchased" does not refer to whether one of Saoud's clients purchased one of the products listed in paragraphs (a) through (d) of Professional Services; it refers to whether Saoud has purchased insurance coverage for the services listed in paragraphs (a) through (d). This is made evident by the fact that paragraphs (b) and (c) state, "(b) the . . . attempted sale . . . of disability income insurance (*if purchased* as indicated on the Certificate of Insurance); (c) the . . . attempted sale . . . of indexed/fixed annuities, (*if purchased* as indicated on the Certificate of Insurance)." (ECF No. 22-1, PageID.590 (emphases added).)

To summarize, taking Saoud's affidavit in the light most favorable to the Saouds, Everest has not shown that every reasonable jury would find that Saoud's offers of the 1 Global memoranda to Berardi, Diller, and Grady were not "Professional Services" as defined in the policy.

That almost resolves step one of this coverage dispute, but there are two remaining issues before moving to step two.

First, to the extent that the Saouds seek reimbursement for Tremblays' suit, Everest is entitled to summary judgment on that claim. In the above discussion, the Court repeatedly referred to Saoud's offer of the 1 Global memorandum to Berardi, Diller, and Grady and (intentionally) did not mention Saoud's offer to the Tremblays. That is because Saoud's affidavit was prepared for the Berardi, Diller, and Grady

20

suits and not for the Tremblays' suit. Indeed, Saoud's affidavit says nothing about how the 1 Global product was offered to the Tremblays. And the Court has reviewed the Tremblays' complaint and the associated state court opinion granting Saoud and his company summary disposition, and those papers also do not provide the context for Saoud's offer of the 1 Global product to the Tremblays. So the Saouds have not come forth with evidence showing that when Saoud offered the 1 Global product to the Tremblays, he was engaged in "planning activities in conjunction with services described in paragraphs (a) through (d)" of the "Professional Services" definition. It follows that to the extent that the Saouds seek reimbursement for the attorney's fees they expended in defending the Tremblays' suit, Everest is entitled to summary judgment on that claim.

The second loose end stems from the fact that there are cross-motions for summary judgment before the Court. Thus far, the Court has taken the evidence in the light most favorable to the Saouds and found that Everest has not shown that every reasonable jury would find that Saoud was not engaged in "Professional Services." But what about the other side of the coin? Have the Saouds produced evidence that would lead every reasonable jury to find that Saoud was engaged in "Professional Services" when he offered the 1 Global product to Berardi, Diller, and Grady?

The Court need not tie up this loose end. Even if the Court were to find for the Saouds at step one of the coverage analysis, there is still the possibility that a policy exclusion negates coverage at step two. And as will be explained next, the briefing

and the record are not sufficient for the Court to conclude that the "unregistered security" exclusion does not apply. Thus, a finding that the Saouds prevail at step one as a matter of law would not warrant summary judgment in their favor. So the Court declines to address whether every reasonable jury would find that Saoud was engaged in "Professional Services" when he offered the 1 Global memoranda to Berardi, Diller, and Grady.

## B.

In addressing the parties' coverage dispute, the second step is to determine whether a policy exclusion negates coverage. Everest argues that the Saouds are not entitled to insurance coverage because when Saoud offered or sold the 1 Global memorandum, he offered or sold a "security" that was not registered with Security and Exchange Commission. In other words, Everest says the "unregistered securities exclusion" negates coverage.

## 1.

While the language of the unregistered-securities exclusion seems like it would be a good place to start, in fact there is a threshold issue: whether Everest has waived its right to assert the exclusion or is estopped from doing so.

The Saouds argue that, as a matter of law, waiver or estoppel applies. They point out that they notified Everest of at least the Berardi suit in December 2018. (*Id.* at PageID.351.) And the Saouds highlight the fact that a few months later, they sent Everest another letter requesting defense in the state court lawsuits. (*Id.* at PageID.329–330.) And in May 2019, the Saouds informed Everest of upcoming

22

mediation in *Berardi*, *Diller*, and *Grady* and requested Everest's participation. (*Id.* at PageID.330–331.) Yet, Everest never responded to any of these communications. It was not until after the Saouds filed this lawsuit seeking a declaration of coverage, that Everest finally sent the Saouds a letter informing them that coverage would be denied. That was in August 2019—over eight months after the Saouds informed Everest of *Berardi*. (ECF No. 21, PageID.493.) So, say the Saouds, Everest's conduct amounts to a waiver of its rights to assert a policy exclusion or warrants estopping Everest from doing so. (ECF No. 21, PageID.349, 351.)

The Court understands the Saouds' frustration. Faced with three state court lawsuits, a Michigan Licensing Department proceeding, and an SEC subpoena, the Saouds understandably wanted, and arguably deserved, a thumbs up or down from the insurance company collecting their premiums. At the least, Everest could have clearly stated that it needed more time to assess coverage and so it was reserving its rights to deny coverage (i.e., it could have issued the typical "reservation of rights" letter).

But aside from the fact that the Saouds had the option to sue Everest and force an answer (as they now have done), the problem for the Saouds is that the cases they cite do not support an application of waiver or estoppel.

In two of the cases the Saouds cite—*Smit v. State Farm Mutual Automobile Insurance* and *Fire Insurance Exchange v. Fox*—the courts did not enforce waiver or estoppel against the insurance company. *See* 525 N.W.2d 528, 533 (Mich. Ct. App. 1994); 423 N.W.2d 325, 327 (Mich. Ct. App. 1988). And in *Smit*, waiver or estoppel

was an issue because the insurance company had at first asserted only certain exclusions but later asserted another. *See* 525 N.W.2d at 530. Here, Everest did not tell the Saouds that certain exclusions applied only to now raise another—Everest did not tell the Saouds anything. As for *Fire Insurance Exchange*, the court held that a four-month delay in responding to an insured's request for defense was—as a matter of law—*not* long enough for estoppel. 423 N.W.2d at 327. As such, *Fire Insurance Exchange* sheds little light on the eight-month delay here.

The Saouds also direct the Court's attention to *Meirthew v. Last*, 135 N.W.2d 353 (Mich. 1965), and *Multi-States Transportation, Inc. v. Michigan Mutual Insurance Co.*, 398 N.W.2d 462 (Mich. Ct. App. 1986). True, in both cases, the courts estopped the insurance companies from asserting a policy exclusion. *See Meirthew*, 135 N.W.2d at 356; *Multi-States*, 398 N.W.2d at 466. But in both cases the insurance companies defended the insureds in the underlying lawsuit for two years before issuing a reservation-of-rights letter, *Meirthew*, 135 N.W.2d at 354–55, or asserting an exclusion, *Multi-States*, 398 N.W.2d at 466. Under that scenario, the insured was actually prejudiced by the delay, *Meirthew*, 135 N.W.2d at 354, or the court presumed prejudice, *see Multi-States*, 398 N.W.2d at 465–66; *see also Meirthew*, 135 N.W.2d at 354 (finding insurance company's reservation of rights was "unreasonably and prejudicially tardy"). Here, Everest's delay was far less than two years. But more importantly, Everest never provided Saoud or his company a defense in *Berardi*, *Diller*, *Grady*, or *Tremblay* (or any other proceeding).

24

This last point is worth expanding. In addition to *Meirthew* and *Multi-States*, this Court reviewed other cases where courts barred insurance companies from denying coverage because the companies unduly delayed in asserting their rights. *See Home-Owners Ins. Co. v. Fourment*, No. 327751, 2017 WL 781596, at *4 (Mich. Ct. App. Feb. 21, 2017); *Cozzens v. Bazzani Bldg. Co.*, 456 F. Supp. 192, 202 (E.D. Mich. 1978). *Cf. Cincinnati Ins. Co. v. Hall*, No. 297600, 2011 WL 2342704, at *3 (Mich. Ct. App. June 14, 2011) (declining to hold that insurance company's five-month delay in issuing a reservation-of-rights letter was, as a matter of law, timely). In every one of the cases the Court reviewed, the insurance company provided a defense to the insured in the underlying litigation. That matters. It is presumptively unfair for an insurance company to control the litigation and then, late in the game, tell the insured he may not be covered—that leaves the insured to suffer the consequences of decisions he did not make. But in this case, Everest never provided a defense to Saoud in any of the underlying proceedings and, as far as this Court can tell, Saoud (through his personally retained counsel) decided to settle those proceedings. Thus, as another judge of this District reasoned, "the cases cited by Plaintiff do not purport to establish any sort of general rule requiring that an insurer must act upon a request for coverage within a 'reasonable' time. Rather, each of these decisions . . . addressed a . . . situation . . . where an insurer undertakes the defense of an insured, and then later issues a reservation of rights letter indicating that coverage might not be available." *State Bar of Michigan v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 07-12599, 2008 WL 4901108, at *10 (E.D. Mich. Nov. 10, 2008).

25

While what has been said suffices to deny the Saouds' request for summary judgment on waiver and estoppel, in its response brief to the Saouds' motion, Everest asks this Court to go one step further. Everest claims that *it* is entitled to summary judgment on the issues of wavier and estoppel. (ECF No. 27, PageID.739.)

Although it is generally improper to seek relief in a response brief (that is what motions are for), the Court will address Everest's request. The Saouds have sought summary judgment on waiver and estoppel—issues that they bear the burden of persuasion at trial. And "[i]n cases where the party moving for summary judgment . . . bears the burden of persuasion at trial, the party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (internal quotation marks omitted). So the Saouds should have come forth with all the evidence they have in favor of wavier and estoppel. Thus, there is no prejudice to the Saouds in addressing Everest's request for a finding that it did not waive policy exclusions and is not estopped from asserting them.

In deciding that the Saouds had not carried their burden of establishing waiver or estoppel, it was sufficient to find that the cases cited by the Saouds were unpersuasive. But it does not necessarily follow from that finding that the case law supports Everest's request for summary judgment. So the Court takes a broader view of the law applying waiver or estoppel against an insurer.

26

Under Michigan law, the "application of waiver and estoppel [against an insurance company] is limited." *See Kirschner v. Process Design Assocs., Inc.*, 592 N.W.2d 707, 709 (Mich. 1999). This is because barring an insurance company from asserting an exclusion has the effect of forcing the company to cover a risk that, under the express language of the policy, it said it would not cover. *See Kirschner*, 592 N.W.2d at 709. Indeed, estoppel or waiver forces the insurance company to cover a risk for which it did not collect premiums. *See Lee v. Evergreen Regency Co-op. & Mgmt. Sys., Inc.*, 390 N.W.2d 183, 186 (Mich. Ct. App. 1986).

Although the application of waiver or estoppel against insurance companies is "limited," some cases do exist, and the Michigan Court of Appeals in *Lee* attempted to place them into two classes. *Lee*'s first class is largely based on language in *Morrill v. Gallagher*, 122 N.W.2d 687 (Mich. 1963). In *Morrill*, the Michigan Supreme Court explained that where an insurance company declines to defend its insured in a suit brought by an injured party, when the injured party later sues the insurance company, the insurance company generally cannot relitigate issues that were or might have been litigated in the prior suit. *See Morrill*, 122 N.W.2d at 691. Further, "where an insurer conducts the defense of an action for personal injuries against the insured, it becomes bound by the judgment as to all matters at issue in such action even though it is not a formal party, so that it cannot subsequently deny that the claim was covered by its policy where the issue was settled adversely to it in the action for damages." *Id.* Thus, *Lee*'s first class of cases are similar to the more familiar doctrine of collateral estoppel. *See Lee*, 390 N.W.2d at 186. "The second class of cases,"

27

the court in *Lee* explained, "involves instances where the inequity of forcing the insurer to pay on a risk for which it never collected premiums is outweighed by the inequity suffered by the insured because of the insurance company's actions." *Id.*

Based on the description provided in *Morrill*, this case does not fall within *Lee*'s first class of cases. Here, the insureds—not the injured parties—are suing their insurer. Nor is this a case "where an insurer conduct[ed] the defense of an action . . . against the insured." *Morrill*, 122 N.W.2d at 691. Indeed, the whole point is that Everest did not provide a defense for Saoud in the underlying proceedings.

And apart from the description provided in *Morrill*, *Smit v. State Farm Mutual Automobile Insurance* also shows that this case does not fall within *Lee*'s first class of cases. There, Dawn Senneker was making a delivery for her employer in a minivan and hit Ronald Smit. 525 N.W.2d 528, 529 (Mich. Ct. App. 1994). When Smit sued Senneker, Senneker's insurer, State Farm, declined to defend on the basis of two policy provisions. *Id.* Smit and Senneker then settled, with Senneker assigning her right to sue State Farm to Smit. *Id.* When Smit later sued State Farm, State Farm asserted an exclusion it had not previously asserted: that the minivan was owned or leased by Senneker's employer. *Id.* at 530. In deciding whether waiver and estoppel should apply, the court found that the facts were not similar to those in *Lee*'s first class of cases. As to whether State Farm should have raised the ownership issue in the underlying litigation, the court explained that while "evidence pertaining to the ownership of the vehicle and the employment relationship might have been introduced in a trial of the underlying action," it would not have been relevant to

28

Smit's claim against Senneker. *Id.* at 531. Additionally, if State Farm had provided Senneker an attorney for her defense, that attorney might have faced a conflict of interest: "[t]he employment relationship, if proven, would not be a valid defense to [Smit's] claim against Senneker, but it might exclude coverage for [Senneker], which would be against her interests." *Id.* Further, the court explained that the cases "included in *Lee*'s first class do not involve a consent judgment. . . [those] cases are closely akin to the principle behind collateral estoppel, but that principle does not apply to consent judgments where factual issues are neither tried nor conceded." *Id.* at 532. For all those reasons, the case did not fall within *Lee*'s first class of cases. *See id.*

The Court acknowledges that this case is not exactly like *Smit*. Unlike the evidence of the employment relationship in *Smit*, the evidence supporting the underlying claims against Saoud also supports an application of a policy exclusion in this case. In particular, Berardi, Diller, and Grady each claimed that Saoud sold a "security" that had not been registered under Michigan's Securities Act, and, here, Everest relies upon an exclusion requiring it to show that the 1 Global product was a "security" under the federal Securities Acts. The evidentiary overlap suggests that Everest could have litigated whether the 1 Global memorandum was a "security" in the underlying suits, and because it did not, it should not be able to do so now. So the facts of this case are not perfectly aligned with those in *Smit*.

But the facts are still close enough to warrant the same outcome. As in *Smit*, had Everest supplied Saoud with an attorney in the underlying actions, that attorney

would have faced a conflict: it was to Saoud's advantage to argue that the 1 Global product was *not* a "security" but it would have been to Everest's advantage to argue that the 1 Global product *was* a "security." Further, as in *Smit*, the Berardi, Diller, and Grady suits (as well as the Licensing Department proceeding) all ended in settlements—so the issue of whether the 1 Global product was a security was "neither tried nor conceded," 525 N.W.2d at 532. Thus, this Court concludes that this case does not fall within *Lee*'s first category.

As for *Lee*'s second class of cases, the Court will be brief. Cases in the second category involve an insurance company "misrepresent[ing] the terms of the policy to the insured" or "defend[ing] the insured without reserving the right to deny coverage." *Lee*, 390 N.W.2d at 186. Here, there is no evidence suggesting that Everest misled Saoud about the terms of the policy. And, as discussed, Everest never defended Saoud in any proceeding. So this case is not like those in *Lee*'s second class, either.

Perhaps all of this can be simplified a bit. At least one court has pointed out that estopping an insurance company from asserting an exclusion requires a showing that the insured was prejudiced by the insurance company's conduct. *See Cincinnati Ins. Co. v. Hall*, No. 297600, 2011 WL 2342704, at *3 (Mich. Ct. App. June 14, 2011). Here, there is no evidence—whether via affidavit, deposition, or otherwise— suggesting that had Everest made a coverage determination sooner, or had it reserved its rights sooner, Saoud would have settled any of the underlying proceedings for less (or would have prevailed at trial). Nor is there any evidence that had Everest made a coverage determination sooner, Saoud would have expended less

in attorney's fees defending the underlying proceedings. True, in the briefs, the Saouds' attorney makes a half-hearted attempt to establish prejudice. (*See* ECF No. 21, PageID.351 (asserting that Saoud litigated the underlying suits "as if coverage was available").) But "an attorney's statement in a brief is not evidence." *Associacao Brasileira de Medicina de Grupo v. Stryker Corp.*, 891 F.3d 615, 621 (6th Cir. 2018).

All things having been considered, the Court finds, as a matter of law, that Everest did not waive its ability to assert the unregistered-security exclusion and that it is not estopped from asserting that exclusion in this litigation.

## 2.

So Everest is not barred from asserting the unregistered-securities exclusion. But does the exclusion apply to Saoud's conduct? The exclusion states, "[Everest] shall not be liable to pay any Loss resulting from any Claim against an Insured . . . [b]ased upon, attributable to, or arising out of the use of or investment in any *security* that is not registered with the Securities and Exchange Commission." (ECF No. 22-1, PageID.593, 597 (emphasis added).) Everest thinks the exclusion applies as a matter of law; the Saouds disagree.

As a preliminary matter, the Court is not persuaded by Everest's suggestion that the language of the exclusion unambiguously turns on what the suits (or administrative proceedings) against Saoud alleged. (*See* ECF No. 22, PageID.570 (asserting that the "underlying actions explicitly allege" that the 1 Global memorandum was an unregistered security).) True, the word "Claim" in the exclusion suggests that the focus should be on whether Berardi, Diller, and Grady alleged that

31

the 1 Global memorandum was a "security." But other exclusions expressly use the word "alleged." For instance, the policy states, "[Everest] shall not be liable to pay any Loss resulting from any Claim against an Insured: . . . based upon, attributable to, or arising out of the *actual or alleged* failure to collect, pay, or return any premium . . . ; [or] based upon, attributable to, or arising out of any *actual or alleged* price fixing, . . . unfair trade practices, or anticompetitive conduct." (ECF No. 22-1, PageID.595 (emphasis added).) As the unregistered-security exclusion does not use the phrase "actual or alleged," the Court is not persuaded that the language of the exclusion unambiguously restricts the inquiry to what was alleged in the state court complaints, the Licensing Department proceedings, or the SEC subpoena.

The parties briefing and the text of the unregistered-securities exclusion narrows the parties' dispute. No one claims that the 1 Global product was "registered with the Securities and Exchange Commission." Instead, the parties dispute whether the 1 Global product was a "security" within the meaning of the exclusion. Although the word "security," is not defined in the policy, the exclusion references "the Securities and Exchange Commission." So, most naturally, the word "security" means a security under the Securities Act of 1933 and the Securities Exchange Act of 1934. Indeed, Everest suggests that the definition of "security" from the Securities Acts should be used to interpret the exclusion (*see* ECF No. 22, PageID.571 (citing the leading case interpreting "security" under the Securities Acts)), and the Saouds do not expressly argue for a different definition (*see* ECF No. 26, PageID.677–683). So

the parties' dispute over the applicability of the unregistered-securities exclusion narrows to whether the 1 Global product was a "security" under the Securities Acts.

So how do the Securities Acts define "security"? The Securities Acts define the term broadly, setting out a veritable laundry list of financial instruments that qualify as a "security." *See* 15 U.S.C. §§ 77b(a)(1), 77c(a)(3). As relevant to this case, a "security" under the Securities Act of 1933 includes "any note, . . . [or] investment contract," 15 U.S.C. § 77b(a)(1), except for a note that "arises out of a current transaction . . . and which has a maturity at the time of issuance of not exceeding nine months," 15 U.S.C. § 77c(a)(3). The Securities and Exchange Act of 1934 provides a very similar definition of "security." A "security" under the 1934 Act also includes "any note, . . . [or] investment contract," except for a note that "has a maturity at the time of issuance of not exceeding nine months." 15 U.S.C. § 78c(a)(10).

In an attempt to show that the 1 Global product fits within these definitions, Everest directs this Court to three sets of documents. One set consists of the complaints filed by Berardi, Diller, and Grady; each of their complaints allege that the 1 Global product Saoud sold was a security. Everest also relies on cease-and-desist orders issued by Michigan's Licensing Department; although the May 2018 order is not part of the record, the September 2018 order states, "The [Licensing Department's] investigation developed evidence that [Saoud] offered or sold unregistered securities on behalf of 1 Global . . . to Michigan investor FR." (ECF No. 22-3, PageID.636.) Third, Everest points to an opinion issued in the SEC's case (in Florida) against 1 Global, Ruderman (1 Global's CEO), and others; there, the court

stated that the 1 Global memoranda "are securities and subject to federal securities regulation." *Sec. & Exch. Comm'n v. 1 Glob. Cap. LLC*, No. 18-CV-61991, 2019 WL 1670799, at *7 (S.D. Fla. Feb. 8, 2019).

For purposes of summary judgment, each of these sets of documents are of limited evidentiary value.

Consider the state court complaints first. While Berardi, Diller, and Grady *alleged* that the Saouds had sold unregistered securities, no judge or jury ever concluded that those allegations had merit: all three cases settled.

As for the cease-and-desist orders, it is true that Michigan's Licensing Department made a factual finding that Saoud had sold unregistered securities and issued an order for him to immediately stop doing so. But the cease-and-desist order also stated that a final order would not be entered if Saoud timely requested a hearing. (ECF No. 22-3, PageID.638.) Saoud did just that, and the Licensing Department and Saoud subsequently entered a consent judgment. And the consent judgment describes the violations in the earlier cease-and desist-orders as "alleged," and further states that Saoud "neither admits nor denies the allegations in the [cease-and-desist orders] or any wrongdoing in connection with th[e] matter." (ECF No. 22-3, PageID.628–629.) So, like the state court lawsuits, the issue of whether the 1 Global product was a "security" was not litigated to finality in the Licensing Department proceedings.

That leaves the opinion of the court presiding over the SEC's suit against 1 Global. Referring to that opinion, Everest states that the 1 Global product "at the

center of this action has specifically been found to be an unregistered security as a matter of law." (ECF No. 22, PageID.570.) This is not accurate. Because the court was deciding a motion to dismiss filed by Ruderman, it had to accept as true all of the SEC's allegations that the 1 Global product was a security. *See 1 Global*, 2019 WL 1670799, at *3 (applying Rule 12(b)(6) standard). Moreover, while the court in *1 Global* may have spoken in more definitive terms, it was only tasked with deciding whether the 1 Global product was plausibly a security. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)).

In all then, the statements that the 1 Global product was a security in the state court complaints, the Licensing Department's cease-and-desist orders, and the *1 Global* opinion are more akin to unproven allegations than established fact or reliable evidence.

Now couple that evidentiary shortfall with the applicable summary-judgment standard. A policy exclusion is an affirmative defense meaning that at trial, Everest has the ultimate burden of persuading a jury that the exclusion applies. *See Shelton v. Auto-Owners Ins. Co.*, 899 N.W.2d 744, 749 (Mich. Ct. App. 2017). And, as explained above, when a party "moving for summary judgment also bears the burden of persuasion at trial, the party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve

it." *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (internal quotation marks omitted). Given the limited evidentiary value of the state court complaints, the Licensing Department orders, and the *1 Global* opinion, Everest has failed to show that "the record is so one-sided as to rule out the prospect of a finding in favor of the [Saouds] on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (discussing burden where party seeks summary judgment on an issue that it must prove at trial).

What has been said up to this point suggests that this Court should outright deny Everest summary judgment. But the law reveals that a path to summary judgment remains open to Everest. Recall that under the Security and Exchange Act of 1934 (and, similarly, under the 1933 Act), "[t]he term 'security' means any note" (with an exception for notes that mature in nine months or less). In interpreting this language, the Supreme Court explained, "because the Securities Acts define 'security' to include 'any note,' [courts are to] begin with a presumption that every note is a security." *Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990). This presumption can be rebutted by showing that the note "bears a strong . . . resemblance" to a family of four types of notes that are categorically not a "security" or by showing that the family should be expanded to include a fifth member. *See id.* at 67.

Here, no one claims that the 1 Global product is not a "note." And from this Court's understanding of the product, it is a note. The 1 Global product was titled "Memorandum of Indebtedness," and Saoud's clients provided a large sum of money to 1 Global in hopes of having 1 Global repay that money with interest. That fits the

definition of a note. Note, Black's Law Dictionary (11th ed. 2019) ("[a] written promise by one party (the maker) to pay money to another party (the payee) or to bearer"); *see also Costa v. Carambola Partners, LLC*, 590 F. Supp. 2d 1141, 1147 (D. Minn. 2008) (relying on Black's Law Dictionary for definition of a "note" in interpreting the Securities Acts, perhaps with the modification of an "unconditional" written promise to pay). And because it is a note, this Court must presume it is a "security" under the Securities Acts. *Reves*, 494 U.S. at 65. (To the extent the 1 Global memorandum instead fits the definition of an "investment contract," *see Deckebach v. La Vida Charters, Inc. of Fla.*, 867 F.2d 278, 281 (6th Cir. 1989), that would not help the Saouds: it would only mean that the 1 Global memorandum was a "security" without further inquiry.)

So the question becomes whether the Saouds have done enough to rebut the *Reves* presumption that any note is a "security."

Although not expressly addressing the presumption, the Saouds point to two documents that could be construed as an attempt to rebut it. One is the affidavit Saoud filed in the Berardi, Diller, and Grady actions. There, Saoud averred, "I was advised by more than one attorney that 1 Global loans were not securities." (ECF No. 21-3, PageID.362.) The Saouds also stress that this averment is consistent with allegations in the complaint the SEC filed against Jan Atlas, the lawyer that Ruderman solicited to opine that the 1 Global product was not a security. In that complaint, the SEC alleged that 1 Global and Ruderman used Atlas' opinions to assure 1 Global sales agents (like Saoud) "that the notes were not securities and the

agents did not need to have a securities license to offer and sell the notes." (ECF No. 26, PageID.712.)

Saoud's affidavit and the SEC's complaint against Atlas do not rebut the *Reves* presumption that the 1 Global memorandum was a security. Saoud does not say which attorney or attorneys told him that the 1 Global product was not a note or what the attorneys did to make that determination. Indeed, it is entirely unclear whether the attorneys who advised Saoud conducted the family-resemblance test set out in *Reves*. Thus, neither this Court nor a jury could possibly determine the weight to assign these attorneys' opinions. Moreover, it is possible, if not probable, that one of the attorney opinions that Saoud relied upon was from Atlas. Yet the SEC complaint clearly alleges that at least two law firms opined that the 1 Global product was a security and that when Atlas authored a contrary opinion letter, "Atlas knew that certain facts stated in the letter on which he was basing his opinion were false, and that he was omitting from the letter other facts inconsistent with his opinion." (ECF No. 26, PageID.710.) And the Court need not take the SEC's word for it: Atlas pled guilty to criminal charges and admitted that when he drafted the first opinion letter he was aware of "strong indicators that the investment opportunity was a security" and that when he drafted his second opinion letter "he knew that the 1 Global investment offering fell squarely within the definition of a security under the federal securities laws." Plea Agreement, *U.S. v. Atlas*, No. 19-60258 (S.D. Fla. Oct. 24, 2019); *see also S.E.C. v. Atlas*, No. 19-62303 (S.D. Fla. Oct. 24, 2019) (consent judgment).

Because the Saouds have not rebutted the *Reves* presumption, it would seem to follow that the unregistered-security exclusion entitles Everest to summary judgment. Although Everest's evidence does not show (as a matter of law) that the 1 Global memorandum is a "security," a note is presumed to be a security under *Reves*. And, as just explained, the Saouds have not rebutted that presumption.

But one wrinkle precludes summary judgment in favor of Everest. The Court has so far not discussed the exception for notes that mature in nine months or less. Recall that under the Securities Acts, "[t]he term 'security' means any note . . . but shall not include . . . any note . . . which has a maturity at the time of issuance of not exceeding nine months." 15 U.S.C. § 78c(a)(10); 15 U.S.C. § 77c(a)(3) (similar). Although this language seems to include all notes that mature in nine months or less, courts have not construed the language so broadly. Citing decisions by several federal appellate courts, the Ninth Circuit has held, "We agree with these circuits that logic and legislative history favor limiting the short-term note exception to commercial paper and hold that the [*Reves*] presumption that a note is a security applies equally to notes of less than nine months maturity that are not commercial paper." *S.E.C. v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1132 (9th Cir. 1991). And while one court has offered a well-reasoned counterpoint to *R.G. Reynolds Enterprises*, even that court relented in the end: "For almost fifty years, courts have consistently held that when Congress spoke of notes with a maturity not exceeding nine months, it meant commercial paper, not investment securities." *Auctus Fund, LLC v. Sauer Energy, Inc.*, 444 F. Supp. 3d 279, 290 (D. Mass. 2020).

So whether Everest is entitled to summary judgment ultimately boils down to these two questions: did any of the 1 Global memoranda that Saoud offered mature in nine months or less? If so, were those memoranda "commercial paper"? If either answer is plainly "no," Everest should be awarded summary judgment via the unregistered-security exclusion.

The Court has reviewed several descriptions of "commercial paper" in the Securities Acts context, and it seems unlikely that the 1 Global memoranda falls within those definitions. *See Reves v. Ernst & Young*, 494 U.S. 56, 70 (1990) (indicating that commercial paper is "short-term, high quality instruments issued to fund current operations and sold only to highly sophisticated investors"); Sec. & Exch. Comm'n Release Notice No. 4412, 1961 WL 61632 (Sept. 20, 1961) (quoting both Senate and House of Representatives reports for the Securities Act of 1933 and indicating that commercial paper is "not ordinarily purchased by the general public" and is "issued to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks"); S. Rep. No. 47, at 3–4 (1933) (indicating that nine-month exception to securities registration was for commercial paper arising out of "current commercial, agricultural, or industrial transactions, and which are not intended to be marketed to the public").

That said, the parties have offered no argument on the definition of "commercial paper" and have not provided the Court with sufficient evidence to decide whether the 1 Global memorandum falls with the nine-month exception.

40

Indeed, no party has even provided this Court with a copy of the 1 Global memorandum. Accordingly, as set out below, the Court will order additional briefing on the nine-month exception only and then decide whether the unregistered-security exclusion in the insurance policy applies as a matter of law.

## C.

Because the unregistered-security exclusion may negate coverage entirely, the Court need not address Everest's other arguments. For instance, Everest argues that even if there is coverage, it would not have to pay any attorney's fees incurred in a proceeding before Saoud gave it notice of that particular proceeding. (*See* ECF No. 28, PageID.757; ECF No. 27, PageID.746–747.) (Further, given that this argument about pre-tender defense costs was raised in responsive briefing (as opposed to Everest's motion), the issue might have been improperly raised.)

## IV.

The Court offers a summary of the findings in this opinion.

At step one of the coverage framework, Everest is entitled to summary judgment on the Saouds' claim for the defense costs expended in the Tremblay lawsuit because Saoud's affidavit does not disclose the context of his offers of the 1 Global product to the Tremblays. But Everest is not entitled to summary judgment at step one on the Saouds' claim for the defense costs and the settlement amounts in the Berardi, Diller, and Grady suits, the Michigan Licensing Department proceeding, and the SEC subpoena. Based on Saoud's affidavit, a reasonable jury could find that Saoud's offer of the 1 Global memoranda to Berardi, Diller, and Grady were

"Professional Services." And it is not clear to what extent the Michigan Licensing Department proceeding and the SEC subpoena were based on the offers to Berardi, Diller, and Grady. For now, the Court need not and does not opine on the Saouds' request for summary judgment at step one.

The Saoud's are denied summary judgment on their claim that Everest waived all of the policy exclusions or is estopped from asserting any of them. Everest is entitled to summary judgment that it did not waive the unregistered-security exclusion and that it is not estopped from asserting that particular exclusion. (Although these rulings are not symmetrical, it is not now necessary to find that, as a matter of law, Everest did not waive, and is not estopped from asserting, *any* exclusion.)

As for whether the unregistered-security exclusion negates coverage, the parties are ordered to file supplemental briefs not exceeding 10 pages that cite to relevant law and evidence. The parties are to brief and present evidence on the following: (1) whether any of the 1 Global memoranda that gave rise to the underlying proceedings "ha[d] a maturity at the time of issuance of not exceeding nine months," and, if so, (2) whether any of those short-term notes were "commercial paper." As explained, if either answer is plainly "no," Everest is entitled to summary judgment. No other issues may be addressed by the parties' briefs or supplemental evidence. The parties' supplemental briefs and evidence are due on or before September 3, 2021.

It may be that the findings made in this opinion and order have shifted the parties' view of the strengths and weaknesses of their positions. If so, the parties are

encouraged to meet and confer in an attempt to resolve this matter without further briefing or discovery.

The Saouds' motion for summary judgment (ECF No. 21) and Everest's motion for summary judgment (ECF No. 22) are granted in part and denied in part as detailed above and the remainder of both motions are held in abeyance pending the September 3 briefs.

SO ORDERED.

Dated: July 28, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE