UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM SAOUD,
PATRICIA BOLAND-SAOUD, and
BILL SAOUD FINANCIAL, LLC,

        Plaintiffs/Counter-Defendants,

v.

EVEREST INDEMNITY INSURANCE
COMPANY,

        Defendant/Counter-Claimant.

Case No. 19-12389
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [22] AND DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT [21]**

---

In 2017 and 2018, William Saoud, who runs Bill Saoud Financial, LLC, offered some of his clients an investment product called the "1 Global Memorandum of Indebtedness." To oversimplify a bit, 1 Global lent money to businesses that did not want to or could not borrow from traditional banks. (*See* ECF No. 32, PageID.825.) These businesses repaid 1 Global by giving 1 Global a percentage of their daily revenue. (*See id.* at PageID.826.) To get the money to loan to the businesses, 1 Global solicited investors. Via the Memorandum of Indebtedness, an investor would agree to loan 1 Global money with the hope that 1 Global would repay the money with high interest. Several of Saoud's clients signed the 1 Global Memorandum of Indebtedness, agreeing to loan 1 Global substantial sums ($260,000 in one instance).

Unfortunately for these clients and for Saoud, 1 Global's operations were not completely legitimate. In fact, 1 Global allegedly used $50 million in investor funds to buy bad credit card debt and 1 Global's CEO allegedly took another $28 million for personal use. By July 2018, 1 Global was bankrupt. And in August 2018, the Securities and Exchange Commission sued 1 Global and its CEO for, among other things, selling unregistered securities. *See Sec. & Exch. Comm'n v. 1 Global Capital LLC*, No. 18-61991 (S.D. Fla. filed Aug. 23, 2018).

In late 2018, several of Saoud's clients who signed the 1 Global memorandum sued Saoud in state court. (ECF No. 21, PageID.374, 385, 397.) In or around July 2019, three of the lawsuits settled. (Aside from the lawsuits, Michigan's Department of Licensing and Regulatory Affairs pursued administrative remedies against Saoud and the SEC served a subpoena on Saoud. (*See* ECF No. 21-5, PageID.413; ECF No. 22, PageID.635.))

Around the time that three of the state court lawsuits settled, Saoud, his company, and his wife who worked at the company (the Saouds) filed this federal lawsuit against Everest Indemnity Insurance Company. (ECF No. 1.) Everest had provided the Saouds with professional liability insurance. The Saouds asked this Court to declare that under the insurance policy, Everest was required to reimburse them for the attorney's fees they expended and the settlements they paid in the state court suits. (ECF No. 1, PageID.17–18.) The Saouds also sought coverage for the money they paid defending or resolving administrative proceedings relating to the 1 Global memorandum.

2

After discovery, both sides filed motions for summary judgment. (ECF Nos. 21, 22.) (Or, to be really precise, Everest filed a motion for judgment on the pleadings that the Court converted into a summary-judgment motion. (*See* ECF No. 30.))

In addressing these cross motions, the Court found that Everest might be entitled to summary judgment because a policy exclusion applied. *See Saoud v. Everest Indem. Ins. Co.*, — F. Supp. 3d —, No. 19-12389, 2021 WL 3186736, at *17 (E.D. Mich. July 28, 2021). The exclusion in question states, "[Everest] shall not be liable to pay any Loss resulting from any Claim against an Insured . . . [b]ased upon, attributable to, or arising out of the use of or investment in any *security* that is not registered with the Securities and Exchange Commission." (ECF No. 22-1, PageID.593, 597 (emphasis added).) Although the insurance policy did not define "security," the Court found that the term should be given the same meaning as "security" in the Securities Act of 1933 and the Securities Exchange Act of 1934 (Securities Acts). *Saoud*, 2021 WL 3186736, at *14. And under the 1933 Act, a "security" included "any note, . . . [or] investment contract," 15 U.S.C. § 77b(a)(1), except for a note that "arises out of a current transaction . . . and which has a maturity at the time of issuance of not exceeding nine months," 15 U.S.C. § 77c(a)(3). Similarly, under the 1934 Act, a "security" included "any note, . . . [or] investment contract," except for a note that "has a maturity at the time of issuance of not exceeding nine months." 15 U.S.C. § 78c(a)(10). The Court further found that because the 1 Global memorandum was a note, Supreme Court precedent deemed it presumptively a "security" under those two definitions. *Saoud*, 2021 WL 3186736, at *15 (citing *Reves*

3

*v. Ernst & Young*, 494 U.S. 56, 65 (1990)). All of this pointed toward granting summary judgment in favor of Everest.

But the Court could not fully resolve the summary judgment motions. In particular, it did not have enough information to decide whether the 1 Global memorandum fell within the carveout provided by the Securities Acts, i.e., whether the memorandum had "a maturity at the time of issuance of not exceeding nine months." *See Saoud*, 2021 WL 3186736, at *16–17. One problem was that no party had supplied the Court with copies of the 1 Global memoranda that Saoud offered his clients; so the Court had no way to know how long they took to mature. *See id*. Second, courts had construed the nine-month exception to only encompass "commercial paper." *See id*. at *16 (citing cases). And so if the 1 Global memorandum was not commercial paper, it would not fall within the exception for a second, independent reason. But the parties had provided the Court no briefing or evidence on whether the memorandum was "commercial paper." *See id*.

The Court thus ordered supplemental briefing. In particular, "[t]he parties [were] to brief and present evidence on the following: (1) whether any of the 1 Global memoranda that gave rise to the underlying proceedings 'ha[d] a maturity at the time of issuance of not exceeding nine months,' and, if so, (2) whether any of those short-term notes were 'commercial paper.'" *Saoud*, 2021 WL 3186736, at *18. "No other issues may be addressed by the parties' briefs or supplemental evidence," the Court directed. *Id*.

The parties have filed their supplemental briefs, but the Saouds have not followed that last direction. They attempt to insert a new argument that was not adequately raised during the summary judgment briefing. In particular, they point out that the policy exclusion is for "Claim[s] . . . [b]ased upon, attributable to, or arising out of the use of or investment in any security that is not registered with the Securities and Exchange Commission." (ECF No. 22-1, PageID.593, 597). So in the Saouds' view, the exclusion applies only if the state court complaints claimed that Saoud sold a security that was required to be registered with the SEC. (ECF No. 33, PageID.853–858.) Yet, according to the Saouds, the state court complaints did not make that claim—instead they claimed violations of Michigan's securities laws. (*Id.* at PageID.856.) It follows, in the Saouds' view, that the policy exclusion does not preclude indemnification for the state court settlements and attorney's fees. (*See id.* at PageID.853–858.)

This argument is forfeited. When the parties initially filed their motions for summary judgment, the Saouds filed three briefs: an opening and a reply brief in support of their motion for summary judgment and a response brief to Everest's motion. And in these briefs, the Saouds made several arguments for why the unregistered-security exclusion did not apply. (ECF No. 21, PageID.349–352; ECF No. 26, PageID.677–683; ECF No. 29, PageID.763–764.) Yet at no point did they argue that the exclusion was inapplicable because the state court complaints did not allege that Saoud sold a security that was required to be registered with the SEC. And in its prior opinion, the Court proceeded past this threshold issue. Accordingly,

the Court deems the argument forfeited (in addition to being beyond the scope of the permitted supplemental briefing).

True, where an argument is obviously correct, deeming it forfeited might result in a miscarriage of justice. *Cf. In re Morris*, 260 F.3d 654, 664 (6th Cir. 2001) (discussing exceptions to rule that arguments not raised in the district court are forfeited on appeal). As such, the Court will examine the Saouds' interpretation of the unregistered-securities exclusion—but only to decide whether it is obviously correct.

The Saouds make several arguments for why, in their view, the unregistered-security exclusion applies only if the state court complaints alleged that the 1 Global memorandum was a security that needed to be registered with the SEC. For one, they point out that other policy exclusions use the phrase "actual or alleged" (e.g., "[Everest] shall not be liable to pay any Loss resulting from any Claim against an Insured . . . based upon, attributable to, or arising out of any *actual or alleged* price fixing"), whereas the unregistered-security exclusion does not use "actual or alleged." (*Compare* ECF No. 22-1, PageID.595, *with* ECF No. 22-1, PageID.597.) And the Saouds point out that some of the other exclusions expressly exclude coverage for state law violations (e.g., "violation[s] of [ERISA] . . . or any similar provisions of any federal, state, local or statutory law or common law" (ECF No. 22, PageID.594)), whereas the unregistered-security exclusion does not mention state law (ECF No. 33, PageID.855). In the Saouds' view, both of these textual differences show that the unregistered-security exclusion is narrow and that it does not apply unless the state court plaintiffs claimed that they were offered or sold a security not registered with

the SEC. (ECF No. 33, PageID.855, 858.) Further, say the Saouds, not only did the state court complaints fail to assert that Saoud sold a security not registered with the SEC, the complaints alleged the opposite: that the 1 Global memorandum was not a "federally covered" security. (ECF No. 33, PageID.856.) Indeed, the state court complaints alleged a violation of Michigan's securities laws, but those laws do not prohibit the sale of "federally covered" securities. Mich. Comp. Laws § 451.2301; *see also* 15 U.S.C. § 77r(b) (defining "federally covered").

These arguments do not show that the Saouds' interpretation of the unregistered-security exclusion is obviously correct. The exclusion uses the phrase "arising out of": "[Everest] shall not be liable to pay any Loss resulting from any Claim against an Insured . . . [b]ased upon, attributable to, or *arising out of* the use of or investment in any security that is not registered with the Securities and Exchange Commission." And generally, the phrase "arising out of" is broad: "the general consensus [is] that the phrase 'arising out of' should be given a broad reading such as 'originating from' or 'growing out of' or 'flowing from' or 'done in connection with.'" *Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 804 (10th Cir. 1998); *see also McKusick v. Travelers Indem. Co.*, 632 N.W.2d 525, 532 (Mich. Ct. App. 2001) (interpreting "arising out of" broadly); *but cf. Century Mut. Ins. Co. v. League Gen. Ins. Co.*, 541 N.W.2d 272, 274 (Mich. Ct. App. 1995) (interpreting "arising out of" in auto policy more narrowly). And each of the state court suits originated from, grew out of, or flowed from the offer of or investment in the 1 Global memorandum. So if the 1 Global memorandum was a "security" (the very question being litigated in this

7

case), then it at least arguably follows that the state court claims "ar[ose] out of the use of or investment in any security that is not registered with the Securities and Exchange Commission." Thus, the Saouds' interpretation of the exclusion is not obviously correct, and it is not a miscarriage of justice to deem their arguments for that interpretation forfeited.

With that, the Court turns to the two issues that it directed the parties to brief: (1) whether any of the 1 Global memoranda that gave rise to the underlying proceedings had a maturity at the time of issuance not exceeding nine months, and, if so, (2) whether any of those short-term notes were "commercial paper." *Saoud*, 2021 WL 3186736, at *18. As stated in the prior opinion, "if either answer is plainly 'no,' Everest is entitled to summary judgment." *Id.*

### 1.

With respect to the first question, there are no fact issues in dispute.

Since the initial round of briefing, the Court has been provided with copies of the 1 Global memoranda that Saoud offered to three clients who later sued him. The "Maturity Date" clause in all three is identical. It states, "The indebtedness shall mature at the end of the ninth month from the Effective Date (the 'Maturity Date') and shall automatically rollover to a new indebtedness unless [1 Global] receives written notice of termination by the [Investor] no less than thirty (30) days before the Maturity Date." (ECF No. 32, PageID.825, 835, 845.)

Although the law is sparse, it favors Everest. The maturity clause in the 1 Global memoranda states that the note "shall automatically rollover to a new

indebtedness." In Release Notice 4412, the Securities and Exchange Commission provided, "the staff of the Commission has interpreted Section 3(a)(3) [of the 1933 Act] to exclude as not satisfying the nine-month maturity standard, obligations payable on demand or having provision for automatic 'roll over.'" Sec. & Exch. Comm'n Release Notice, Release No. 4412 (Sept. 20, 1961). And at least one court has found that particular statement about automatic rollover to be persuasive. *Sec. & Exch. Comm'n v. J.T. Wallenbrock & Assocs.*, No. CV 02-808 ER, 2002 WL 35649374, at *5 (C.D. Cal. Apr. 3, 2002). And other courts have more generally found Release Notice 4412 to be persuasive. *See e.g., In re NBW Com. Paper Litig.*, 813 F. Supp. 7, 17 (D.D.C. 1992) ("[Release Notice 4412] has generally been acknowledged by the courts of appeals, and specifically adopted by the Second and Seventh Circuits."). And tellingly, the SEC has taken the position that the very notes at issue here—the 1 Global memoranda—do not mature in nine months because of the automatic rollover. Brief for Plaintiff at 20, *Sec. & Exch. Comm'n v. 1 Global Capital LLC*, No. 18-cv-61991 (S.D. Fla. Nov. 16, 2018) ("The rollover provision in reality transformed the note into a longer investment than nine months."). On the other side of the scale, Saoud offers no legal authority providing that a nine-month note with an automatic rollover still has "a maturity at the time of issuance of not exceeding nine months."

But what about the "unless" clause? The 1 Global memorandum states that the indebtedness would automatically rollover "unless [1 Global] receives written notice of termination by the [Investor] no less than thirty (30) days before the Maturity Date." (ECF No. 32, PageID.825, 835, 845.) An argument could be made that because

9

an investor can elect to have his or her investment mature at nine months, the memorandum falls within the nine-month exception despite the automatic rollover.

The short response to this argument is that the Saouds have not made it. The longer one is that it is hard to imagine a note with an automatic rollover that lacks an "unless terminated by the investor" clause. Take the 1 Global memorandum, for example. Removing the "unless" clause means that the preceding language would read: "The indebtedness shall mature at the end of the ninth month from the Effective Date (the 'Maturity Date') and shall automatically rollover to a new indebtedness." That could be much more simply drafted as "The indebtedness shall mature at the end of the eighteenth month from the Effective Date (the 'Maturity Date')." In other words, the automatic rollover clause is the very reason that the "unless" clause exists—the two are a package deal. So when the SEC stated in Release Notice 4412 that "obligations . . . having provision for automatic 'roll over'" are not included in the nine-month exception, it may well have expected that those obligations would allow investors to stop automatic rollovers. All of this is to say that the "unless" clause does not plainly carry the day for the Saouds, which is a sufficient determination given that the Saouds have not argued that the "unless" clause negates the automatic rollover clause.

The Saouds instead argue that for the three clients who sued in state court, their automatic rollover never came into effect. They explain that when 1 Global filed bankruptcy in July 2018, none of the three memoranda had reached nine months. And, say the Saouds, the bankruptcy stayed automatic rollovers. (ECF No. 33,

10

PageID.859.) Thus, the Saouds conclude, the memoranda had a maturity period not exceeding nine months. (*See id.*)

The Court is not persuaded. The Saouds' argument ignores the plain language of the definition of "security." A "security" includes "any note" except for a note that "has a maturity *at the time of issuance* of not exceeding nine months." 15 U.S.C. §§ 77c(a)(3), 78c(a)(10) (emphasis added). Because the maturity is determined "at the time of issuance," post-issuance events like a bankruptcy stay are irrelevant.

To summarize, the carveout in the definition of "security" for notes that mature in nine months or less does not include the 1 Global memoranda because they have automatic rollovers. So the memoranda fall within the definition of "security" under the Securities Acts. And the term "security" in the policy exclusion should be accorded the same meaning as the term "security" under the Securities Acts. Further, no one disputes that the memoranda were not registered with the SEC. It follows that Everest has carried its summary-judgment burden of showing that the unregistered-security exclusion applies. The Saouds are not entitled to insurance coverage as a matter of law.

## 2.

And even assuming that the automatic rollover does not take the 1 Global memorandum outside the nine-month exception, that exception only applies to "commercial paper," *see Saoud*, 2021 WL 3186736, at *16 (citing cases), and the memorandum is not commercial paper.

This alternate holding stems from the narrow definition of "commercial paper" in this context. Prior to the enactment of the 1933 Act, both the Senate and House commented on the nine-month exception. (The Court recognizes that typically the plain text of the statute controls; but in interpreting the term "security," the Supreme Court has shown a willingness to examine Congress' intent. *See Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990); *see also Auctus Fund, LLC v. Sauer Energy, Inc.*, 444 F. Supp. 3d 279, 280 (D. Mass. 2020) (explaining that courts have not accorded the nine-month exception its plain-text meaning).) A Senate Report stated, "It is not intended under the bill to require the registration of short-term commercial paper which, as is the usual practice, is made to mature in a few months and ordinarily is not advertised for sale to the general public." Sec. & Exch. Comm'n Release Notice, Release No. 4412 (Sept. 20, 1961) (quoting S. Rep. No. 47, at 3–4 (1933)). And a House Report stated that the nine-month exception "exempts short-term paper of the type available for discount at a Federal Reserve bank and of a type which is rarely bought by private investors." *Id.* (quoting H.R. Rep. No. 85 at 15 (1933)). Examining both of these statements, the SEC stated in Release Notice 4412, "The legislative history of the Act makes clear that Section 3(a)(3) applies only to prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve banks." *Id.* (The "eligible for discounting by Federal Reserve banks" part of the definition is no longer applicable. *See* Robert Rapp, 1 Federal Securities Act of 1933 § 3.04 (2021).)

12

As discussed, courts have accorded deference to Release Notice 4412. *See In re NBW Com. Paper Litig.*, 813 F. Supp. 7, 17 (D.D.C. 1992); *S.E.C. v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1132–33 (9th Cir. 1991).

The Saouds offer some evidence that suggests that the 1 Global memorandum fits these descriptions of commercial paper. The Saouds have supplied an opinion letter that the 1 Global memorandum was not advertised on the internet or "any other medium addressed to the general public" (ECF No. 33, PageID.922), the memoranda were purchased by the general public and private investors. Further, by signing the memorandum, each investor acknowledged that he or she was a "sophisticated" individual and was signing the memorandum "for a commercial purpose" (ECF No. 32, PageID.828); *see* Section 3(a)(3) Commercial Paper Exemption: Selected Guidance, Practical Law Practice Note 8-562-9906 ("In general, [commercial paper] is marketed through [commercial paper] dealers and other sales channels designed to reach only institutional investors and certain highly sophisticated individuals.").

But in light of other considerations, the opinion letter and the investors' acknowledgements about their sophistication would not permit a reasonable jury to find that the 1 Global memorandum was commercial paper. According to the SEC's complaint filed against 1 Global, "1 Global received at least $287 million from 3,400 investors located in at least 25 states." See Am. Compl., *Sec. & Exch. Comm'n v. 1 Global Capital LLC*, No. 18-61991 (S.D. Fla. Sept. 26, 2018). That strongly suggests that the 1 Global memorandum was sold to the public and not only the type of highly sophisticated investors contemplated by Release Notice 4412. And while the SEC's

13

allegation in the Florida case is not a fact for purposes of this case, it is a fact that Saoud offered the product to several of his clients, all of whom appear to have been ordinary, private investors. The Court also seriously doubts that the memoranda were "prime quality negotiable commercial paper." Nothing in the record suggests that the 1 Global memorandum was rated in one of the two highest ratings categories. *See* Section 3(a)(3) Commercial Paper Exemption: Selected Guidance, Practical Law Practice Note 8-562-9906 ("In current practice, [commercial paper] is generally considered to be of prime quality and negotiable if it is rated in one of the two highest ratings categories (at least A-2, P-2 and F2 from Standard & Poor's, Moody's and Fitch, respectively).").

In short, the Court finds that the 1 Global memoranda giving rise to this suit were not "commercial paper." And so for this independent, alternative reason, the memoranda did not fall within the nine-month exception to the definition of "security" under the Securities Acts.

* * *

For the reasons given, the Court GRANTS Everest's motion for summary judgment (ECF No. 22) and DENIES the Saouds' motion for summary judgment (ECF No. 21). The Court will issue a separate judgment in favor of Everest.

SO ORDERED.

Dated: September 29, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

14